**PECO ENERGY COMPANY,**
**Petitioner,**

v.

**COMMONWEALTH of Pennsylvania,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 2, 2003.
Decided July 15, 2003.

R. Scott Shearer, Harrisburg, for petitioner.

Bart J. DeLuca, Jr., Harrisburg, for respondent.

Before COLINS, President Judge, and SMITH–RIBNER, J., and LEADBETTER, J.

OPINION BY President Judge COLINS.

PECO Energy Corporation petitions for review of the order of the Board of Finance and Revenue denying its petition for resettlement of its 1997 public utility realty tax in which it contested the Department of Revenue's (Revenue) settlement of PECO's 1997 tax as it determined the state taxable value of PECO's utility realty.

In April 1998, PECO filed its 1997 public utility realty tax report pursuant to Section 1102–A(b) of the law known as the Public Utility Realty Tax Act (PURTA),[1] "showing the amount and manner of computation of the State taxable value" upon which it based its payment of its utility realty tax. PECO reported the 1997 state taxable value of its utility realty to be $184,246,005 for a tax of $7,738,332.[2] The Department of Revenue audited PECO's 1997 PURTA return, and as a result, it settled PECO's 1997 utility realty tax at $63,480,824 based on a settled state taxable value of $1,511,448,190.

PECO petitioned for resettlement, averring that Revenue had disregarded the cost of the utility realty as reflected on its books of account, disallowed proper depreciation, and failed to give effect to book accounting adjustments to the cost of the utility realty made by PECO in 1997. PECO averred that it had reported the state taxable value of its utility realty using the cost and reserve for depreciation, determined as of December 31, 1997, as shown in books of account computed pursuant to generally accepted accounting principles (GAAP) and in its 1997 annual report to shareholders, and as reported to the Federal Energy Regulatory Commission (FERC). The Board of Appeals refused resettlement, and the Board of Finance and Revenue concluded that Revenue had properly calculated the state taxable value of PECO's utility realty, valuing the realty at original cost and rejecting PECO's accounting adjustments as improper for purposes of PURTA reporting.

The parties stipulated to the following facts. In years before 1997, PECO prepared its books of account in accordance with Statement of Financial Accounting Standards (SFAS) No. 71, Accounting for the Effects of Certain Types of Regulation.

---

1. Act of March 4, 1971, P.L. 6, as amended, 72 P.S. § 8102–A(b). PURTA was amended by the Act of May 12, 1999, P.L. 26. Unless otherwise specified, all cites to PURTA in this opinion refer to the Act as it read in 1997.

2. For the 1995 tax year, PECO reported a state taxable value of $1,441,558,601, and for 1996 it reported a state taxable value of $1,396,441,347.

After the enactment of the Electricity Generation Customer Choice and Competition Act (Competition Act),[3] in April 1997, PECO filed with the Public Utility Commission a restructuring plan detailing its proposal to implement the deregulation of its electric generation operations, identifying $7.5 billion in stranded costs related to retail electric generation. The PUC rejected PECO's plan, and it issued a final restructuring order dated May 14, 1998 capping service rates from January 1999 through June 30, 2007 and entitling PECO to $5.3 billion in stranded costs.

In connection with deregulation of electric generation and restructuring, for the calendar year 1997, PECO adopted the accounting principles embodied in SFAS Nos. 101 and 121, and discontinued the application of SFAS No. 71. PECO prepared its 1997 annual report to shareholders based on books of account prepared according to SFAS Nos. 101 and 121. Pursuant to SFAS No. 121, PECO wrote down the cost of its "impaired" utility generation assets.[4] Similarly, on its 1997 annual report to the Federal Energy Commission (FERC Form 1), PECO reported the value of its assets at their original cost and deducted the impairment as "additional depreciation." The state taxable value of utility realty reported in PECO's 1997 PURTA report reflects the impairment of assets by incorporating the write-down or additional depreciation.

For the 1997 tax year, "state taxable value" was defined in pertinent part as "[t]he cost of utility realty, less reserves for depreciation and depletion, as shown by the books of account of a public utility...." PURTA Section 1101–A(4), 72 P.S. § 8101–A(4). Neither the PURTA statute nor case law defines "cost" or the appropriate method of determining "depreciation."

Before this Court,[5] PECO argues that the state taxable value of its utility realty for PURTA purposes is to be determined in conformity with GAAP, which requires the write-down of impaired assets as reported in its financial statements and annual report to shareholders, or in the alternative, is to be determined based on original cost less additional depreciation as reported on FERC Form 1. PECO also argues that Revenue's settlement violates constitutional due process and uniformity because the taxable value bears no reasonable relationship to actual value.

---

**3.** 66 Pa.C.S. §§ 2801–2812. The Competition Act was enacted in December 1996 and became effective January 1, 1997.

**4.** The Introduction to SFAS No. 121 states:

Long-lived assets such as plant and equipment generally are recorded at cost, which is usually fair value at the date of acquisition. The original cost usually is reduced over time by depreciation (amortization) so that the cost of the asset is allocated to the periods in which the asset is used. That practice has been modified in some circumstances when an asset has been determined to be impaired, in which case the asset has been written down to a new carrying amount that is less than the remaining cost and a loss has been recognized.

(Stipulation of Facts, Exhibit 15.) Impairment refers to circumstances in which an asset's carrying amount may not be recoverable, e.g., because of a change in the way the asset is used, a decrease in market value, or continuing operating or cash flow losses associated with an asset used for producing revenue. Id.

**5.** In appeals from the Board of Finance and Revenue, our review is broad because this Court functions as a trial court, even though such cases are heard in our appellate jurisdiction. *Solar Turbines Inc. v. Commonwealth,* 816 A.2d 362 (Pa.Cmwlth.2003). Questions raised in the petition for review are determined on the record made before this Court; parties may stipulate to facts upon which they agree and issues that remain to be tried. Pa. R.A.P. 1571(f), (h).

The Commonwealth argues that PECO may not reduce the state taxable value of its utility reality by claiming a one-time write-down of the cost of its utility realty, or additional depreciation, as a result of a change in its accounting practices and that Revenue's valuation of the realty without reference to the write-down or additional depreciation does not involve a constitutional issue. The Commonwealth takes the position that although the statute does not define the method of depreciation that may be used to calculate state taxable value, depreciation refers to the diminution in value of property owing to use, wear, and age, and that a one-time write-down in value is not depreciation, but rather it is related to an extraordinary event taking into account political and economic factors.

■ We begin by noting that financial accounting and tax accounting have different objectives and serve different purposes.

> The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and other [interested parties].... The primary goal of the [ ] tax system, in contrast, is the equitable collection of revenue.... Consistent with its goals and responsibilities, financial accounting has its foundation in the principal of conservatism, with its corollary that "possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets. In view of [the tax system's] markedly different goals and responsibilities, understatement of [value] is not destined to be its guiding light. Given this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable.

\* \* \* \*

> [A] presumptive equivalency between tax and financial accounting would create insurmountable difficulties of tax administration. Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. "Generally accepted accounting principles," rather tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management. Such, indeed, is precisely the case here. Variances of this sort may be tolerable in financial reporting, but they are questionable in a tax system designed to ensure as far as possible that similarly situated taxpayers pay the same tax. If management's election among "acceptable" options were dispositive for tax purposes, a firm, indeed could decide unilaterally—within limits dictated only by its accountants—the tax it wished to pay. Such unilateral decisions would not just make the [tax system] inequitable; they would make it unenforceable.

*Thor Power Tool Company v. Commissioner*, 439 U.S. 522, 542–543, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) (footnotes omitted). As a general rule, a taxpayer is not entitled to determine its tax liability in conformity with its financial accounting method. The Commonwealth argues that PURTA is a tax-generating statute and not a regulatory code and the fact that the Public Utility Commission or FERC either permits or requires a write-down in the value of assets has nothing to do with the valuation of utility realty under PURTA.

First, we note that PECO adopted SFAS No. 121 for financial accounting purposes in 1997 when in fact the PUC did not issue its initial or final restructuring order until 1998 and when PECO did not have sufficient information upon which to reasonably or reliably determine how deregu-

lation would affect its electric generation business when it began to be implemented in 1999. While the adoption of SFAS No. 121 may have been necessary from a business accounting standpoint, we must conclude that the claimed decline in the value of PECO's utility realty as a result of deregulation began after the 1997 tax year, and for that reason, any write-down of value in 1997 would be inappropriate regardless of how state taxable value were calculated.

Notably, the General Assembly amended PURTA in 1999 to remove land and improvements that are indispensable to electric generation from the definition of utility realty, and it changed the definition of state taxable value to reflect actual value. The definition of state taxable value now reads, in pertinent part: "Current market value calculated by adjusting the assessed value for county real estate tax purposes for the taxable year for the common level ratio of assessed values to market valued for the county as established by the State Tax Equalization Board...." Current PURTA Section 1101–A(4), 72 P.S. § 8101–A(4).

■ As it read in 1997, PURTA's definition of state taxable value began with cost, which may be reduced by reserves for depreciation and depletion. The Commonwealth contends that "cost" refers to original cost and that depreciation for PURTA purposes refers only to age, wear and tear, and other factors related solely to the property itself and does not include any extraordinary reduction in value related to economic or political factors. We agree.

Although statutory construction is a matter for the courts to determine, great weight will be given to the interpretation of the agency administering the statute in question. *Shawnee Development, Inc. v. Commonwealth*, 799 A.2d 882 (Pa.Cmwlth. 2002), *affirmed*, 572 Pa. 665, 819 A.2d 528

(2003). PURTA defines state taxable value as cost less depreciation. The plain meaning of cost is original cost. The meaning of depreciation is less clear. Where the words of a statute are not clear and free from all ambiguity, it must be construed to effectuate the intention of the General Assembly, which may be ascertained by considering, among other matters, the occasion and necessity for the statute, the object to be obtained, and the consequences of a particular interpretation. 1 Pa.C.S. § 1921.

PURTA is a special tax on utility realty, distributed by the Commonwealth to local taxing authorities, the amount of which cannot be less than the gross amount of real estate taxes that the local taxing authorities could have imposed on the real property. *American Telephone and Telegraph Co. v. Board of Property Assessment, Appeals and Review of Allegheny County*, 461 Pa. 716, 337 A.2d 844 (1975) (citing Pa. Const. art. VIII, § 4). In 1997, PURTA applied to any person or entity furnishing public utility service under the jurisdiction of the PUC or a corresponding state or federal regulatory agency, including any electric cooperative corporation, municipality, or municipal authority furnishing public utility service. PURTA Section 1101–A(2), 72 P.S. § 8101–A(2).

PURTA permitted a utility to self-assess its PURTA tax liability on the basis of the depreciated value of its utility realty. In permitting a reduction in cost for depreciation within meaning of state taxable value, the General Assembly could not have contemplated a one-time, extraordinary reduction in the value of utility realty based on deregulation of one aspect (i.e., electric generation) or one type of utility because permitting such a reduction to one type of utility would result in other utilities shouldering a greater portion of the gross

amount of real estate taxes that the local taxing authorities could have imposed on the real property.[6] Depreciation for purposes of determining a utility's state table value can only mean a reasonable reduction in value attributable to factors affecting all utilities, i.e., physical depreciation. To conclude otherwise would lead to uncertainty and unfairness in allocation of the tax burden.

Through 1996, PECO and other utilities reported the value of their utility realty using original cost less depreciation as reported to the PUC. The fact that the PUC permitted or required a one-time write-down in the value of PECO's electric generation assets in light of deregulation of electric generation had no effect on the value of its utility realty for tax purposes.

Finally, citing *Shawnee*, PECO argues that Revenue's settlement of its realty utility tax liability violates its due process rights because it does not produce a result that is reasonably related to the actual value of the realty subject to tax. *Shawnee* involved a question of a corporation's capital stock tax liability, and in that context the due process claim related to apportionment for commerce clause purposes (i.e., to avoid double taxation). In her concurring opinion, Judge Leadbetter stated that the same due process principles apply to any statute that mandates the use of a fixed formula to compute a tax where actual value is difficult to ascertain. 799 A.2d at 890. The due process analysis employed by Judge Leadbetter in *Shawnee* is inapplicable to the present case, where PURTA does not mandate the use of a fixed formula as a means of approximating the actual value of property to be taxed.

As demonstrated by the record in this case, Revenue settled PECO's 1997 PURTA tax liability using the method of depreciation used by PECO, with the removal of the write-down or additional depreciation PECO attributed to the "impairment" of its utility realty as a result of deregulation. Although the settled value may be much higher than the value shown on PECO's books of account, the settled value is in line with the state taxable value PECO reported in 1995 and 1996.

For the reasons stated above, we affirm the order of the Board of Finance and Revenue.

### ORDER

AND NOW, this 15th day of July 2003, the order of the Board of Finance and Revenue is affirmed. Exceptions may be filed within 30 days of entry of this order. Pa. R.A.P. 1571(i).

---

**6.** In the event that the total realty tax equivalent (i.e., total of assessed value multiplied by the applicable tax rate as reported by the local taxing authorities) is greater than the total amount collected from the utilities pursuant to their initial self-assessment, the Department of Revenue imposes an additional assessment on each utility in proportion to the state taxable value it reported. PURTA Section 1104–A(b), 72 P.S. § 8104–A(b).