COLWELL/GENERAL, INC., Petitioner,

v.

INDIANA STATE BOARD OF TAX COMMISSIONERS, Respondent.

No. 02T10–9511–TA–00124.

Tax Court of Indiana.

May 22, 1997.

Dennis C. Becker, Barrett & McNagny, Indianapolis, for petitioner.

Jeffrey A. Modisett, Atty. Gen., Joel Schiff, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

Petitioner Colwell/General Inc. ("Colwell") appeals from a final assessment determination of the State Board of Tax Commissioners. Before the State Board, Colwell claimed (1) that certain of its inventory was entitled to an interstate commerce exemption because it was stored and shipped in its original packaging; (2) that even if the inventory was not stored and shipped in its original packaging, it was still exempt because its value would have been impaired had it been kept in its original packaging; and (3) that it

was entitled to write down the value of another part of its inventory for property tax purposes because that inventory had become essentially unmarketable and had already been reduced in value for internal accounting purposes. The State Board denied these claims. This Court upholds the State Board's decision.

## FACTS AND PROCEDURAL HISTORY

The relevant facts are as follows. Colwell is a Minnesota corporation with operations in Fort Wayne, Garrett, and Kendallville, Indiana. Colwell manufactures color sample cards and other color merchandising tools for the paint industry. Paint manufacturers and sellers, like Benjamin Moore, Ace Hardware, and Porter Paints, contract with Colwell to provide color coded strips, cards, and brochures featuring the various shades of their paints. So, for example, one of Colwell's sample cards presents the four shades of green, from the lighter "Sea Teal" to the deeper "Bright Jade," available for sale at Ace Hardware stores across the country. Joint Ex. 6. The sample cards are placed on display racks with the paints to help customers choose which color of paint they want to buy.

Three of Colwell's four paint sample products, "PNP 10x10x10," "A Arch Chips," and "Packed Bulk Loose Items," constitute what it calls "Pick–n–Pull inventory." Ex. 1F, at 6–7. These products get their name from the way in which they are prepared for sale. After their production, the cards are separated into groups of ten to fifteen identical cards and packaged in small plastic wrappers. The wrapped card packages are then stored in boxes or cartons in a company warehouse. When a customer makes an order, Colwell employees pull the requested samples from the storage cartons and ship them to the customer. Colwell's fourth product, "OD Unopened Cartons," also consists of paint sample strips and cards but this product is packaged for final shipment at the manufacturing line. *Id.*

For the purposes of the March 1, 1994 property tax assessment, Colwell claimed that its entire inventory of color sample strips was exempt under the interstate com-

merce exemption. After an investigation and hearings on the matter, the hearing officer granted the exemption with regards to the OD Unopened Cartons items but denied it for the Pick–n–Pull inventory. Tr. at 67–70; Exs.1B, 1C, 1D & 1E; *see also* Ex. 1I, at 5. The State Board of Tax Commissioners accepted the hearing officer's recommendation. Ex. 1I.

In addition to its paint sample products, Colwell also markets a color code system known as ColorCurve. Developed in the late 1980s, ColorCurve is a method of identifying color numerically as opposed to visually. Colwell vice-president Daniel C. Nicklay gave the following description of ColorCurve at trial:

> The Colorcurve, that's the most precise color communication system in the world, which we developed. And what it is is it's a way to communicate color verbally without actually looking at, at the color, and it's based on a scientific, mathematical formula. Every color can be identified by a, mathematically [sic]. So, any color in the world can be reproduced if you have our literature and formulas.... And so, say a manufacturer has several components that are coming in from throughout country [sic] and he wants to have the colors all be the same, he could come in and say, "We want it to be Colorcure [sic] level eighty-five," or something. Then, the manufacturers will communicate that and, and hit our colors.

Tr. at 14. Colwell's inventory of ColorCurve products consists of color atlases that map out the system for manufacturers and swatch books with removable samples for designers and architects. Tr. at 15; Petr's Br. at 2.

Except for a *de minimus* amount, Colwell manufactured its entire ColorCurve inventory from 1987 to 1989 at a total cost of approximately $1,500,000.[1]

Although Colwell was initially quite sanguine about the potential for ColorCurve, sales have not matched expectations.[2] Colwell presented evidence to show that at the current rate of sale, it would take from twenty to one-hundred years to sell these goods. See Tr. at 16; Ex. 1F, at 3; Ex. 1FA. After several consecutive years of poor sales and in consultation with its professional accountants, Colwell determined in 1995 to write down the value of the inventory. Ex. 4. Vice-president Nicklay testified that Colwell wrote down the inventory by $260,000 for 1991. Tr. at 17. Thereafter, the recorded value of the inventory was decreased by $15,000 per month, for a total write-down of $650,000 by March 1994. Tr. at 18. As a result of these calculations, Colwell's accountants determined that the inventory had an estimated realizable value of only $835,320. Ex. 4.

Despite the poor sales and Colwell's decision to write down the value of its Color-Curve inventory, at no point has Colwell offered these products for sale below cost. Tr. at 23. Nicklay testified that Colwell has not lowered its prices below cost because demand appears to be relatively inelastic. He stated:

> Well, I spoke to our manager of, about this and he, we have not had—people don't complain about the price. It's not a price issue. It's more of acceptability. In order to use it, you have people on both ends and

---

1. The exact cost of the ColorCurve inventory is not clear from the evidence. Vice-president Nicklay testified for Colwell that the approximate cost of the ColorCurve inventory was $1,650,000, Tr. at 16, but Colwell apparently valued the goods at $1,480,137 for tax purposes, Ex. 1F, at 1. Similarly, in a letter to Nicklay, Colwell's accountants first estimate the cost of the inventory at $1,650,000 but then use a figure of $1,485,-320 in subsequent calculations. Ex. 1B. The $1,500,000 approximation is sufficiently precise, however, for present purposes.

2. The specific cause for these poor sales is not clear. Colwell presented some evidence that, by

1995, the colors in some of its ColorCurve inventory were beginning to "fade" and "drift." Tr. at 18, 54, 66. Colwell did not, however, expressly connect the alleged deterioration in the Color-Curve products to its poor sales prior to 1995. Vice-president Nicklay testified only that the drifting of colors was "a little embarrassing" because Colwell was marketing ColorCurve "as the most precise color system in the world." *Id.* In any event, the State Board does not make this an issue and does not dispute that Colwell has had a difficult time selling the ColorCurve inventory.

it just has not taken off. So, we don't have complaints on the price.

Tr. at 23–24.

The state's hearing officer recommended that the State Board disallow the adjustment for the ColorCurve inventory, and Colwell requested review by the State Board. After a hearing on the matter, the State Board issued its final determination rejecting the write-down. Ex. 1I. The Board finally assessed Colwell's entire inventory, including the ColorCurve products, at $4,068,960, with an additional $850 penalty. *Id.* at 1.

## STANDARD OF REVIEW

The State Board is accorded great deference when it acts within the scope of its authority, and this Court will not reverse a final determination by that body unless it is unsupported by substantial evidence, constitutes as abuse of discretion, exceeds statutory authority, or is arbitrary or capricious. *Williams Indus. v. State Bd. of Tax Comm'rs,* 648 N.E.2d 713, 715 (Ind. Tax Ct.1995). The burden of proving the inaccuracy of a State Board determination rests upon the taxpayer appealing the administrative decision. *Herb v. State Bd. of Tax Comm'rs,* 656 N.E.2d 890, 893 (Ind. Tax Ct.1995).

## DISCUSSION AND ANALYSIS

### I. The Interstate Commerce Exemptions

■ Colwell claims that its Pick–n–Pull inventory is exempt from personal property tax under the interstate commerce exemption provided in Ind.Code Ann. § 6–1.1–10–29 (West Supp.1993). The taxpayer bears the burden of proving that it is entitled to an exemption from taxation. *St. Mary's Med. Ctr. of Evansville, Inc. v. State Bd. of Tax Comm'rs,* 534 N.E.2d 277, 281 (Ind. Tax Ct.1989), *aff'd,* 571 N.E.2d 1247 (Ind.1991). Moreover, as with all exemptions, this Court has held that the interstate commerce exemptions must be strictly construed against the taxpayer and in favor of taxation. *Monarch Steel Co. v. State Bd. of Tax Comm'rs,* 611 N.E.2d 708, 713 (Ind. Tax Ct.1993). The Court will, however, endeavor "to give full effect to the legislature's intent and avoid construing [the exemption] 'so narrowly its application is defeated in cases rightly falling within its ambit.'" *Id.* (quoting *Harlan Sprague Dawley, Inc. v. Department of State Revenue,* 605 N.E.2d 1222, 1225 (Ind. Tax Ct.1992)).

■ First, Colwell contends that the items comprising its Pick–n–Pull inventory are exempt under subsection 6–1.1–10–29(b). That subsection states:

> Personal property owned by a manufacturer or processor is exempt from property taxation if the owner is able to show by adequate records that the property is stored and remains in its original package in an in-state warehouse for the purpose of shipment, without further processing, to an out-of-state destination.

Ind.Code Ann. § 6–1.1–10–29(b). According to Colwell, the "original packages" for the Pick–n–Pull items are the polyethylene wrappers holding ten to fifteen sample paint cards. On this view, the original packaging for its Pick–n–Pull inventory is never disturbed. Thus, Colwell contends that these items are stored and remain in their original packages for the purpose of shipment to an out-of-state destination. This Court disagrees.

The regulations define "original package" as "the box, case, bale, skid, bundle, parcel, or aggregation thereof bound together and used by the seller, manufacturer, or packer for shipment." Ind. Admin. Code tit. 50, § 4.2–12–5(d) (1992). In this case, it is clear that Colwell does not use the plastic wrappers for shipping its products within the meaning of the regulation. Colwell manager Ellen P. Mann testified that the polyethylene packets are never used to ship the color sample cards to customers. Tr. at 42–43. The packets of cards are stored in one box and then shifted to another box for shipment according to specific customer orders, Tr. at 44, and the storage box is retained for later use, Tr. at 46. The most Colwell was able to show was that its goods could be shipped to customers in their plastic wrappers. In order to prove this point, Mann actually sent one of the small packets to vice-president Nicklay through the mails prior to trial. Tr.

at 21, 36. The question is not, however, whether the packets could be used for shipping the taxpayer's products but whether they are in fact used for that purpose. Given that Colwell does not dispute that the wrappers are not so employed, this Court holds that Colwell's Pick–n–Pull inventory is not stored in its original packaging for the purpose of shipment out of state. Therefore, this Court holds that Colwell is not entitled to an interstate commerce exemption under subsection 29(b).

The Court notes in addition that Colwell's reliance on *State Bd. of Tax Comm'rs v. Stanadyne, Inc.*, 435 N.E.2d 278 (Ind.Ct. App.1982) is misplaced. In *Stanadyne*, an out-of-state manufacturer of plumbing fixtures claimed an interstate commerce exemption under Ind.Code Ann. § 6–1.1–10–30. *Id.* at 279–80. The central issue was whether the taxpayer's products remained in their original packages.[3] The evidence showed that the manufacturer sealed its products first in individual packages and then placed groups of these packages in larger boxes. The larger boxes were then aggregated together in an Indiana warehouse and placed on pallets for shipment out of state. While the pallets were occasionally unbound and the larger boxes rearranged according to customer orders, the larger boxes were "rarely opened." *Id.* On these facts the Court of Appeals upheld the trial court's finding that "most of the products involved remained in their original packages from the point of manufacture to the point of final destination." *Id.*

Colwell contends that like the manufacturer in *Stanadyne*, it aggregates identical items in plastic packages, and the individual packages are then gathered to meet specific customer orders. Petr's Br. at 11. "In so doing," Colwell emphasizes, "the original plastic wrapping is never opened." *Id.* The analogy breaks down, however, because it was the larger boxes that were not usually opened in *Stanadyne*, not the smaller individual packages. In other words, the products in that case were stored in the same boxes in which they were later shipped. The only change made by the manufacturer was to rearrange the shipping boxes on the pallets. The facts are, of course, very different here, where Colwell stores its products in one box and ships them in another.

■ Second, Colwell argues that even if its Pick–n–Pull inventory is not exempt because the products do not remain in their original packages, the items are exempt under Ind.Code Ann. § 6–1.1–10–29(c) because their value would be impaired if they were stored in their original packages. Subsection 29(c) provides:

> Personal property that is manufactured in Indiana and that would be exempt under subsection (b), except that it is not stored in its original package, is exempt from property taxation if the owner can establish in accordance with exempt inventory procedures, regulations, and rules of the state board of tax commissioners that the property:
>
> (1) is ready for shipment without additional manufacturing or processing, except for packaging; and

**3.** At the time *Stanadyne* was decided, section 30 read:

> Nonresident's property in interstate commerce.—(a) Subject to the limitations contained in subsection (c) of this section, personal property is exempt from taxation if:
> (1) The property is owned by a nonresident of this state;
> (2) The property has been shipped into this state and placed in the original package in a public or private warehouse for the purpose of transshipment to an out-of-state or a within-the-state destination as evidenced by the original bill of lading; and
> (3) The property remains in its original package and in the public or private warehouse.

> (b) Subject to the limitation contained in subsection (c) of this section, personal property is exempt from property taxation if:
> (1) The property has been placed in the original package in a public or private warehouse for the purpose of transshipment to an out-of-state destination as evidenced by the original bill of lading; and
> (2) The property remains in the original package and in the public or private warehouse.
> (c) An exemption provided by this section applies only to the extent that the property is exempt from taxation under the commerce clause of the Constitution of the United States.
> Ind.Code Ann. § 6–1.1–10–30 (Burns 1978) (amended 1978, 1981, and 1984).

(2) will be damaged or have its value impaired if it is stored in its original package.

Ind.Code Ann. § 6–1.1–10–29(c). The State Board does not press the argument that Colwell's pick-n-pull operation constitutes "manufacturing or processing," Respt's Br. at 6, and Colwell concedes that its products would not be physically "damaged" if they were stored in the same boxes in which they are to be shipped, Petr's Br. at 17. Thus, the dispute centers on Colwell's claim that the value of its Pick–n–Pull inventory would be impaired if it were stored in its original packaging.

In support of its contention, Colwell presented evidence that its pick-n-pull method of marketing is substantially more cost effective than prepackaging its products. Ellen Mann testified that in 1982 and 1983, Colwell sold prepackaged color sample strips to Home Depot stores. Tr. at 41. The stores eventually asked Colwell to discontinue the practice, however, because more than half of the cards were going unused. *Id.* Mann stated that in her opinion, prepackaging the Colwell inventory of paint samples rendered it "unsellable." Tr. at 42. In addition, Colwell submitted an affidavit from an executive of Ace Hardware, Inc., Becky Trudeau, in which Trudeau avers that "[i]f Colwell/General would offer Ace [Hardware] prepackaged [display replacement strip packages] prior to an actual store's order, Ace [Hardware] would not be willing to pay the same price that it pays now for the product because much of the order would be wasted." Ex. 3. She stated that Ace Hardware "would pay a lesser price." *Id.*

The Court holds that Colwell's evidence fails to demonstrate the sort of impairment contemplated by the legislature when it enacted subsection 29(c)(2). Colwell contends that the legislature intended to exempt two distinct categories of goods: one set that would be physically damaged if stored in original packaging and another that, although not adversely affected in a physical

sense by such storage, could be marketed more profitably if not stored in original packaging. This argument assumes that the disjunction "or" in subsection 29(c)(2) indicates a separation of different or unlike things. Certainly, "or" may be used in this way, as in the proposition, "The company will have to pay its property taxes *or* face the consequences." *See* Webster's Third New International Dictionary 1585 (1981) (defining "or" in part as "a function word to indicate . . . an alternative between different or unlike things, states, or actions"). But just as often, "or" is used to bring together words or phrases with the same or similar meanings in order that the elements of the disjunction may inform each other. For example, one might say, "The company asked for an abatement *or* reduction in its property taxes, but its request was denied." *See id.* (defining "or" in part as "a function word to indicate . . . the synonymous, equivalent, or substitutive character of two words or phrases").

In this case, it is more likely that the legislature intended the notions of damage to the goods and the impairment of their value to be synonymous descriptions rather than distinct or alternative categories. This is so because were this Court to read subsection (c)(2) as Colwell suggests, the subsection itself would be rendered practically meaningless. It would be operative only in the unlikely event that a taxpayer chose to store its goods in original packages despite the fact that that method of operation was not cost effective. Therefore, with an eye to preserving the vitality of the subsection and mindful that exemptions are strictly construed against the taxpayer, the Court holds that subsection (c)(2) requires a showing that the goods themselves would be damaged or impaired in a physical way by storing them in their original packages. Inasmuch as Colwell failed to adduce any evidence that its sample paint strips would have been damaged or impaired in this way, it is not entitled to an exemption on this claim.[4]

---

**4.** At one point in the course of its final determination, the State Board mentions the case of an Indiana clothing manufacturer that both the Board and Colwell seem to believe was instrumental in leading the General Assembly to enact

Ind.Code Ann. § 6–1.1–10–29(c). The determination reads in relevant part:

Colwell mentioned its understanding of the history of the subsection that is now IC 6–1.1–10–29(c). The State Board is familiar with

## II. Inventory Valuation: Lower of Cost or Market

■ Colwell next argues that the State Board should have permitted it to write down the value of its inventory to the lower of cost or market for the purposes of Indiana property tax because it reduced the recorded value of the inventory for internal accounting purposes. More specifically, Colwell claims that the value of its inventory has decreased some $650,000 below its original cost. In support of this claim, Colwell points out that its sales of the ColorCurve inventory have been dismal. In fact, the evidence shows that Colwell will probably still be trying to sell this inventory well into the twenty-first century. Colwell also submitted a letter from its accountants stating that because of its poor sales performance, generally accepted accounting principles required the company to discount the value of those products. The letter reads in relevant part:

> Generally accepted accounting principles require that [ColorCurve] inventory balances be stated at the lower of cost or market. The relatively low sales activity of the Colorcurve System has indicated a lack of acceptance in the marketplace. As a result, an annual reserve has been recorded to adjust the carrying value of the Colorcurve inventory to an estimated realizable value. At December 31, 1993, the Colorcurve balances were:
>
> | | |
> |---|---|
> | Cost | $1,485,320 |
> | Reserve | ( 620,000) |
> | Estimated Realizable Value | $ 865,320 |

The reserve at December 31, 1993 was therefore 41.7% as a percentage of inventory cost.

The reserve at December 31, 1994 was 77.5% as a percentage of inventory cost.Ex. 4. Because the reserve account established to record the write-downs has been increased by $15,000 per month since 1991, the reserve on March 1, 1994, was $650,000 ($620,000 + $15,000 for January 1994 + $15,000 for February 1994).

In its final determination, the State Board denied Colwell's write-down on the grounds that Colwell had failed to produce sufficient objective evidence that its goods should be valued below cost. The State Board explained:

> Regardless of whose definition one uses [to define market value], the plain fact is that there must be some evidence that the market value of the inventory is less than its cost. . . . The letter from the accounting firm and the testimony concerning the deterioration of the colors may be believable, but it was Colwell's responsibility to provide evidence to the State Board to show that the amount of ColorCurve inventory write-down wa [sic] proper.

Ex. 1I, at 7. The State Board also expressed concern that Colwell "wants to have its cake and eat it too" because Colwell was requesting that its inventory be valued below cost while it continued to sell the ColorCurve products above cost, but the Board did not find this fact determinative. *Id.* at 8. The Board explained that "[i]f Colwell would have explained the basis for the computation, the State Board could have had a basis for making an alternative calculation, taking into account the fact that Colwell continues to sell the ColorCurve inventory for the same price it has always charged." *Id.* at 7. The clear focus of the Board's determination was that

---

that history. A northwest Indiana manufacturer of high quality men's trousers and other garments was unable to fall within the "original package" requirement found in both IC 6–1.1–10–29 and IC 6–1.1–10–30(b). It claimed that the slacks would wrinkle if stored in their shipping packages for the considerable period typical of its operations. The manufacturer stored the slacks on hangers rather than in shipping packages. The slacks were not packaged until immediately prior to shipment so that wrinkles did not damage or impair the high quality nature of the product. . . . Unlike the trouser manufacturer, Colwell's Pick–n–Pull inventory is not damaged or impaired by storage in an original package. It is not the act of storage that prevents the Pick–N–Pull inventory from being placed in its original package. Colwell does not place the Pick–n–Pull inventory into original packages, because it does not yet know in which manner the Pick–n–Pull inventory will be aggregated.

Ex. 1I, at 10–11. Despite the fact that it was apparently Colwell that initially referenced this history, the Court agrees with Colwell that the State Board may not rely on such undocumented allusions to alleged legislative history. In reviewing the State Board's decision, the Court did not consider this anecdote.

"Colwell failed to provide any basis to explain the calculation of the $650,000 write-down." Ex. 1I, at 8. This Court agrees with the State Board.

On proper proof, the State Board permits a taxpayer to value inventory at "the lower of cost or market." Ind.Admin.Code tit. 50, § 4.2–5–3 (1992). The regulations require that taxpayers value inventory at the cost of the goods "as recorded on the regular books and records of the taxpayer," and "[i]f a taxpayer uses the lower of cost or market for valuing inventory for book accounting purposes, this method is allowable for Indiana property tax purposes." *Id.* The regulations provide:

> Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether from damage, deterioration, obsolescence, style change, over-supply, reduction in price levels, or other causes, the inventory items should be stated at a lower level commonly designated as market.

Ind.Admin.Code tit. 50, § 4.2–5–5(a) (1992).

Under these provisions, if a taxpayer is able to prove that the utility of its inventory will be less than its original cost, then the taxpayer may discount the value of the inventory. In this case, Colwell presented evidence that it was selling only a fraction of its inventory each year and that its professional accountants directed the write-down in accordance with generally accepted accounting principles. Although Colwell continued to sell the goods above cost, the evidence of the poor sales, when taken in conjunction with the accountants' testimony, tended to show that the inventory had decreased in value. First, this Court has stated that evidence that a taxpayer is having difficulty selling its inventory tends to prove that the value of the inventory has decreased. *Glass Wholesalers, Inc. v. State Bd. of Tax Comm'rs,* 568 N.E.2d 1116, 1121 (Ind. Tax Ct.1991). Second, although this Court has indicated that a taxpayer's "proper financial accounting methods do not preclude a determination that its method of tax reporting is deficient," *Gulf Stream Coach, Inc. v. State Bd. of Tax Comm'rs,* 519 N.E.2d 238, 241 (Ind. Tax Ct.1988) (citing *Thor Power Tool Co. v.*

*Comm'r,* 439 U.S. 522, 541, 99 S.Ct. 773, 785, 58 L.Ed.2d 785 (1979)), the fact that the taxpayer's tax reporting method and its internal accounting coincide with one another and with generally accepted accounting principles is certainly relevant to a review of its tax reports.

Establishing that its inventory has probably lost value is, however, only half the battle for the taxpayer. The taxpayer must also prove by objective evidence the value of the goods and that that value is less than their cost. In this case, Colwell failed to introduce any evidence explaining its proposed $650,000 write-down. The letter from Colwell's accountants simply states without explication or documentation that the "estimated realizable value" of the inventory as of the end of 1993 was $620,000, and an additional $30,000 was subtracted from the inventory's value for January and February 1994. As the State Board held, this falls short of the sort of objective evidence required to support such a write-down.

The Court notes that the United States Supreme Court reached a similar conclusion in *Thor Power Tool Co. v. Comm'r,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). In that case, the Supreme Court held that a manufacturer of power tools could not write down certain of its inventory absent objective evidence for the lower value. *Id.* at 538, 99 S.Ct. at 784. The high court held that more was required than a "well-educated guess" or "management's collective 'business experience.'" *Id.* at 536, 99 S.Ct. at 783. The Court reasoned in part that "[i]f a taxpayer could write down its inventory on the basis of management's subjective estimates of the goods' ultimate salability, the taxpayer would be able ... 'to determine how much tax it wanted to pay for a given year.'" *Id.*

While Colwell's claim must fail in this instance because it did not substantiate its $650,000 write-down, the Court notes its sympathy for Colwell's position. Where a business is able to demonstrate that a particular good has become essentially unmarketable at any price, it would seem justified in devaluing that inventory for tax purposes. Moreover, the State Board did not argue here that this avenue would be foreclosed by statute or regulation. In any event, a gener-

al showing of a decrease in value is not sufficient. The taxpayer must prove not only the fact of some decline in value but also the amount of the decline based on hard and objective evidence. Colwell's claim fails in the present case because it did not provide such evidence for its calculation of the write-down.

## CONCLUSION

Based on the foregoing, the Court upholds the State Board's final determination that Colwell is not entitled to take an interstate commerce exemption for its Pick–n–Pull inventory or to write down the value of its ColorCurve inventory.