ATTORNEYS FOR PETITIONER:
**RANDAL J. KALTENMARK**
**ZIAADDIN MOLLABASHY**
BARNES & THORNBURG LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**WINSTON LIN**
**PARVINDER K. NIJJAR**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

**FILED**

Sep 05 2017, 4:27 pm

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| JOHN AND SYLVIA VON ERDMANNSDORFF, | ) ) ) |
| Petitioners, | ) ) ) |
| v. | ) Cause No. 49T10-1112-TA-00093 |
| INDIANA DEPARTMENT OF STATE REVENUE, | ) ) ) ) |
| Respondent. | ) ) |

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF STATE REVENUE

**FOR PUBLICATION**
**September 5, 2017**

WENTWORTH, J.

John and Sylvia von Erdmannsdorff have appealed the Indiana Department of State Revenue's Proposed Assessments of adjusted gross income tax (AGIT) for the 2000 through 2009 tax years. This matter concerns whether the Department's Proposed Assessments based on the best information available are valid in light of the

von Erdmannsdorffs' contrary information.[1]  The Court finds in favor of the von Erdmannsdorffs.

**FACTS**

During the years at issue, Mr. von Erdmannsdorff owned and operated a new and used bookstore as a sole proprietorship in the college town of West Lafayette, Indiana.  (See Stipulation of Facts ("Stip.") ¶¶ 1-2; Trial Tr. at 71-72, 128, 145.) Between 2000 and 2006, the sole proprietorship was operated from several adjacent buildings under the distinct business names of "Von's Shops" and "Von's Video and Comics."  (See, e.g., Stip. ¶¶ 1, 22(B)-(C), Exs. 17-J(B)-(C); Trial Tr. at 76.)  Von's Shops was located within four buildings and sold an assortment of new and used books, music in vinyl and CD formats, beads, greeting cards, rocks, and other odds and ends. (See Stip. ¶ 2; Second Stipulation of Facts ("Sec. Stip.") ¶ 1, Ex. 22-J at 530; Trial Tr. at 72-73, 76.)  Von's Video and Comics, located in a building adjacent to Von's Shops, purchased and sold comic books, VHS tapes, and DVDs and, in addition, rented VHS and DVD movies.  (See Trial Tr. at 75-76; Stip. ¶¶ 22(B)-(C), Exs. 17-J(B)-(C).)  In 2006, Von's Video and Comics closed and its inventory was moved to Von's Shops. (See Stip. ¶¶ 22(B)-(C), 22(F), Exs. 17-J(B)-(C), 17-J(F).)  Consequently, Von's Shops began to rent VHS and DVD movies and sell comic books, VHS tapes, and DVDs.  (See Stip. ¶ 22(L), Ex. 17-J(L); Trial Tr. at 75-80.)

In January of 2010, while auditing Von's Shops for the 2007 and 2008 tax years, the Department asked to inspect Von's Shops' general ledgers, federal and state income tax returns, and any supporting state tax workpapers.  (See Stip. ¶¶ 3, 15, Exs.

---

[1] Portions of the evidence are confidential information.  Accordingly, the Court will provide only that information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

1-J, 11-J at 43.) Mr. von Erdmannsdorff replied that because his business had "been operating in the red for years[,]" he did not owe any income tax and therefore had not filed tax returns. (See Stip. ¶¶ 15, 18, Exs. 11-J at 45, 14-J at 96; Trial Tr. at 86-87.) The Department explained that Mr. von Erdmannsdorff needed to file federal and state income tax returns for the years at issue as soon as possible and expanded the scope of its audit to include the 2000 through 2006 and 2009 tax years. (See Stip. ¶ 15, Ex. 11-J at 45, 47.)

By the end of May of 2010, Mr. von Erdmannsdorff had provided the Department with access to, or copies of, Von's Shops' general ledgers, checkbook registers, payroll data, and expense reports for each of the years at issue. (See Stip. ¶¶ 10, 15, Exs. 4-J to 6-J, 11-J at 47-50.) Mr. von Erdmannsdorff, however, did not provide the Department with copies of Von's Shops' inventories, which would have been used to calculate its annual cost of goods sold (hereinafter, "COGS"),[2] because Mr. von Erdmannsdorff did not take inventories during the years at issue. (See Stip.¶ 15, Ex. 11-J at 47-52; Trial Tr. at 27-28, 36, 117, 161-63.) Lacking actual inventory information, the Department determined that it would rely on the general information contained in the category entitled "sole proprietorship sporting goods-hobby-book-music store" from BizStats'[3] for 2006. (See, e.g., Stip. ¶¶ 9, 11-12, Exs. 3-J, 7-J, 8-J at 35.) Accordingly, the Department used the "cost of sales financial ratio of 56.48%" from this BizStats category

---

[2] "Cost of goods sold" refers to the number of inventory items "that are being removed or sold as part of the normal business cycle[.]" (Trial Tr. at 27-28.) "Cost of goods sold generally is computed under a formula that starts with beginning inventory, adds purchases, [and then] subtracts ending inventory[.]" (Trial Tr. at 28.)

[3] "BizStats is an online provider of free business statistics and financial ratios." von Erdmannsdorff v. Indiana Dep't of State Revenue, 53 N.E.3d 621, 623 n.3 (Ind. Tax Ct. 2016) (citation omitted).

3

as the best information available to estimate Von's Shops' annual cost of goods sold. (See Stip. ¶¶ 9, 16, Ex. 3-J, Confd'l Ex. 12-J at 66-67, 69; Trial Tr. at 162-63.)

In June of 2010, the Department explained to Mr. von Erdmannsdorff that if it did not receive all of his completed tax returns by July 30, it would issue Proposed Assessments against the von Erdmannsdorffs based on the best information available to it. (See Stip. ¶¶ 14-15, Exs. 10-J, 11-J at 51-52.) After this deadline passed, the Department issued an Investigation Summary to the von Erdmannsdorffs, detailing the basis and computation of Proposed Assessments using BizStats as the best information available. (See Stip. ¶ 16, Confd'l Ex. 12-J.) On October 26, 2010, the Department issued the Proposed Assessments imposing approximately $245,000 in AGIT, interest, and penalties for the years at issue. (See Stip. ¶ 17, Confd'l Ex. 13-J.)

In December of 2010, the von Erdmannsdorffs protested the Proposed Assessments. (See, e.g., Stip. ¶ 18.) At that time, the von Erdmannsdorffs presented the Department with copies of their federal and state income tax returns for the years at issue. (See Stip. ¶¶ 18, 18(A)-(T), Ex. 14-J, Confd'l Exs. 14-J(A)-(T).) In addition, the von Erdmannsdorffs provided estimates of the annual COGS derived from "reconstructed" inventories for each of the years at issue. (See, e.g., Stip. ¶¶ 18(U)-(W), 22(S), Confd'l Exs. 14-J(U)-(W), Ex. 17-J(S).)

The von Erdmannsdorffs' estimate of the inventory for the 2000 tax year was based on the recollections of Mr. von Erdmannsdorff and his long-time employees together with the measurements of spaces that housed the inventory within Von's Shops. (See, e.g., Stip. ¶ 18(V), Confd'l Ex. 14-J(V); Trial Tr. at 91-96, 134-37, 149.) For instance, the inventories of new books and CDs were developed by approximating

4

the historical placement of shelves and bins, confirming those placements by measuring floor space, estimating the historical inventory held on the shelves and bins, and then multiplying that total by the item's average price. (See, e.g., Stip. ¶¶ 18(V), 22(I), Confd'l Ex. 14-J(V); Ex. 17-J(I); Trial Tr. at 91-96.)

The inventory for the 2009 tax year was developed somewhat differently, using linear measurement and physical count methodologies. (See Stip. ¶ 18(W), Confd'l Ex. 14-J(W); Trial Tr. at 87-92.) More specifically, an inventory of books was developed by first estimating the number of new or used books held on the shelves based on either the measurements of the shelves and the thickness of varying genres of new books or the measurements of the shelves alone, and then, multiplying each total by the average price of a book. (See Stip. ¶ 18(W), Confd'l Ex. 14-J(W) at 245; Trial Tr. at 89-92.) The inventory of the remaining items was developed by physically counting or estimating the number of items and then multiplying each total by the item's average price. (See Stip. ¶ 18(W), Confd'l Ex. 14-J(W) at 244, 246-47; Sec. Stip. ¶¶ 8-9, Exs. 29-J ¶¶ 10-11, 30-J at 19-20, 39-40; Trial Tr. at 88-89.)

Finally, the inventories for the 2001 through 2008 tax years were extrapolated from the 2000 and 2009 inventories, using straight-line adjustments to track the regular flow of inventory over the ten-year assessment period. (See Stip. ¶¶ 19(A), 22(S), Exs. 15-J(A), 17-J(S); Trial Tr. at 41-46, 95-96, 115.) Indeed, the underlying assumption supporting the use of straight-line adjustments was that the incremental changes to the amount or value of inventory remained steady from year-to-year; for instance, if the amount of inventory increased by $100,000 over the ten-year period, "then the increment would be $10,000 per year." (See Trial Tr. at 43.) In addition, the 2001

5

through 2008 inventories incorporated specific short-term adjustments for any period where there was a significant change in the amount or value of inventory items. (See, e.g., Stip. ¶ 22(S), Ex. 17-J(S); Trial Tr. at 43-44, 95-96.)

On July 20, 2011, after conducting a hearing, the Department issued a Letter of Findings denying the von Erdmannsdorffs' protest. (Stip. ¶ 23, Ex. 18-J.) Then, on October 20, 2011, the Department denied the von Erdmannsdorffs' request for rehearing. (Stip. ¶¶ 24-25, Exs. 19-J, 20-J.)

On December 16, 2011, the von Erdmannsdorffs initiated this original tax appeal. The Department subsequently filed a motion for summary judgment, asserting that it was entitled to judgment as a matter of law because the von Erdmannsdorffs' reconstructed inventories, and thus their COGS estimates, lacked probative value. See von Erdmannsdorff v. Indiana Dep't of State Revenue, 53 N.E.3d 621, 625 (Ind. Tax Ct. 2016). The von Erdmannsdorffs filed a counter-motion for partial summary judgment, asserting that the Department made certain errors in computing their alleged AGIT liabilities for the years at issue. Id. at 626. On June 3, 2016, the Court denied the Department's motion, finding a genuine issue of material fact, and granted the von Erdmannsdorffs' counter-motion. Id. The von Erdmannsdorffs' appeal proceeded to trial in October of 2016. The Court heard oral argument on February 21, 2017. Additional facts will be supplied as necessary.

**STANDARD OF REVIEW**

This Court reviews final determinations of the Department de novo. IND. CODE § 6-8.1-5-1(i) (2017). Accordingly, the Court is not bound by the evidence or the issues presented to the Department at the administrative level. Horseshoe Hammond, LLC v.

6

Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

**LAW**

Indiana imposes a tax at the rate of 3.4% on the adjusted gross income of residents like the von Erdmannsdorffs.  See IND. CODE § 6-3-2-1(a) (2000).  The Department, in turn, is charged with administering, collecting, and enforcing that tax.  See IND. CODE § 6-8.1-1-1 (2000) (amended 2002); IND. CODE § 6-8.1-3-1(a) (2000).  Accordingly, the Department may audit any returns filed and investigate any matters relating to the AGIT.  See IND. CODE § 6-8.1-3-12(a) (2000).

When conducting an audit, the Department may "inspect any books, records, or property of any taxpayer which is relevant to the determination of the taxpayer's tax liabilities[.]"  IND. CODE § 6-8.1-4-2(a)(3) (2000).  To that end, every person subject to the AGIT "must keep books and records [(e.g., invoices, register tapes, receipts, cancelled checks, or other source documents)] so that the [D]epartment can determine the amount, if any, of the person's [AGIT] liability . . . by reviewing those books and records."  IND. CODE § 6-8.1-5-4(a) (2000).  In addition, the person must allow the Department to inspect his books and records at all reasonable times.  I.C. § 6-8.1-5-4(c).  If the taxpayer fails to maintain or provide the Department with his books and records, the Department may determine the taxpayer's tax liability based on the best information available to it.  See I.C. § 6-8.1-5-4(a); IND. CODE § 6-8.1-5-1(a) (2000) (amended 2006).

**ANALYSIS**

There is no dispute that the von Erdmannsdorffs did not keep books and records

sufficient for the Department to determine their AGIT liabilities as required by Indiana Code § 6-8.1-5-4(a). Moreover, there is no dispute that in light of the dearth of books and records, the Department properly made the Proposed Assessments using the best information available at that time. Because certain issues regarding the Department's Proposed Assessments were resolved during the summary judgment process, the dispositive issue preserved for trial was whether the Department's Proposed Assessments based on the best information available were still valid in light of the von Erdmannsdroffs' evidence presented at trial.

## I. The von Erdmannsdorffs' COGS Estimates

The von Erdmannsdorffs claim that the Department should have adjusted the Proposed Assessments to reflect their COGS estimates based on reconstructed inventories that are "supported by fact and [] corroborated by third party insurance records[,]" which demonstrates their superior reliability to the information used by the Department. (See Pet'rs' Post-Tr. Br. ("Pet'rs' Br.") at 25-29.) The Department contends, however, that the von Erdmannsdorffs' COGS estimates are unreliable because their reconstructed inventories used flawed methodologies and are not corroborated by the insurance records.[4] (See Resp't Redacted Post-Trial Br. ("Resp't

---

[4] The Department has also claimed that the Court should not consider the von Erdmannsdorffs' COGS estimates because doing so requires the Court to incorporate a federal tax law doctrine, the Cohan Rule, into Indiana's tax laws. (See Resp't Redacted Post-Trial Br. ("Resp't Br.") at 16-18.) The Court, however, finds that it does not need to invoke the Cohan Rule to consider the von Erdmannsdorffs' evidence because, as explained during the summary judgment proceedings, nothing within Indiana's AGIT statutory scheme "expressly precludes taxpayers from offering evidence [to the Court that was] generated post-audit" and the Court's statutorily prescribed de novo standard of review contemplates the introduction of such evidence. See von Erdmannsdorff, 53 N.E.3d at 625. See also e.g., Edward Rose of Ind., LLC v. Metro. Bd. of Zoning Appeals, Div. II, Indianapolis-Marion Cnty., 907 N.E.2d 598, 604 (Ind. Ct. App. 2009) (defining "de novo judicial review" as the "'nondeferential review of an administrative decision, [usually] through a review of the administrative record plus any additional evidence the parties present'" (citation omitted)).

Br.") at 11-16.)

## A. The Reconstructed Inventories

As mentioned, the von Erdmannsdorffs' inventories for each of the years at issue were reconstructed using several different methodologies. The Department claims that these inventories are unreliable because they: 1) were not contemporaneously prepared, 2) estimated the number of books, 3) estimated the cost of inventory, 4) used straight-line adjustments, and 5) included property held for rent, not for sale. (See Resp't Br. at 10-16; Oral Arg. Tr. at 47-48, 51.)

### 1. Contemporaneous Preparation

The Department contends that the von Erdmannsdorffs' reconstructed inventories were infirm because they were prepared at different times by different individuals who relied on nothing more than "tape measure[s] and memories up to a decade old." (See Resp't Br. at 4, 11-15.) Moreover, the Department asserts that the reconstructed inventories are unreliable because the von Erdmannsdorffs completed an inventory for the first time in June of 2010, nearly six-months after the close of the 2009 tax year, not contemporaneously at year-end as required by Treasury Regulation § 1.471-1. (See Oral Arg. Tr. at 42, 51; Resp't Br. at 14-15.)

During the years at issue, Indiana incorporated by reference certain provisions of the Internal Revenue Code and its related regulations by defining adjusted gross income under IRC § 62 as the starting point for calculating an individual's Indiana adjusted gross income. See IND. CODE § 6-3-1-3.5(a) (2000) (amended 2002). In turn, Section 471 of the Internal Revenue Code provides the general rules for performing inventories. See generally I.R.C. § 471 (2017); Treas. Reg. §§ 1.471-1 to -10 (2017)

9

(collectively, the "Inventory Rules"). The Inventory Rules provide that "[i]n order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor." Treas. Reg. § 1.471-1. Cases interpreting the Inventory Rules, however, merely explain that their methodologies must conform as nearly as possible to the customs and best accounting practices of a trade or business and clearly reflect the income. See, e.g., Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 531 (1979) (quoting Treas. Reg. § 1.471-2(a)(1); Van Pickerill & Sons, Inc. v. U.S., 445 F.2d 918, 920 (7th Cir. 1971). See also Wal-Mart Stores, Inc. & Subsidiaries v. C.I.R., 153 F.3d 650, 656 (8th Cir. 1998) (explaining that the rule requiring year-end inventories for books was repealed in 1922).

The Department offered no evidence or legal authority to support its argument that the von Erdmannsdorffs did not use a proper method to reconstruct their inventories or that their failure to contemporaneously prepare their inventories undermined their credibility. The von Erdmannsdorffs, on the other hand, offered expert testimony by, Mr. Richard Bartholomew, an attorney and certified public accountant, who is the Director of Tax Services at the Lafayette, Indiana accounting firm of Girardot, Strauch & Company. (See Stip. ¶ 13, Ex. 9-J; Trial Tr. at 16-21.) Mr. Bartholomew both advised Mr. von Erdmannsdorff on reconstructing inventories and prepared and filed Mr. von Erdmannsdorff's federal and state income tax returns for the years at issue. (See Trial Tr. at 21-22, 36-37.)

Mr. Bartholomew testified that when a ten-year assessment period is at issue, the month that the reconstructed inventories are completed is of minimal importance

10

because the beginning and ending inventory figures even out over the entire period. (See Trial Tr. at 69.) Mr. Bartholomew further testified that the methodologies used to reconstruct Von's Shops' inventories (e.g., physical counts, estimations, measurements, and memories) were consistent with industry practices and clearly reflected Von's Shops' income. (See Trial Tr. at 31-41, 52-56, 63-64; Trial Ex. 4-P.) Moreover, the trial evidence established that the 2009 physical count inventory was completed at the end of 2009, not in 2010 as the Department has alleged. (See Trial Tr. at 87-97; Stip. ¶ 18(W), Confd'l Ex. 14-J(W) at 244; Sec. Stip. ¶¶ 8-9, Exs. 29-J ¶¶ 10-11, 30-J at 19-20 (demonstrating that the 2009 physical count inventory was actually completed in December of 2009 and the inventory of books for 2009 was completed before July of 2010).) In light of this unrebutted evidence, the Department has not shown that the von Erdmannsdorffs' reconstructed inventories are unreliable on the basis that they were not contemporaneously prepared.

### 2. The Inventory Of Books

The Department also contends that the 2009 inventory of books lacks probative value because it "was not an actual count [of books], but [rather] an estimate based on the size of shelving." (See Resp't Br. at 15; Oral Arg. Tr. at 41-43.) Without providing any evidence or legal authority as support, the Department asserts that the von Erdmannsdorffs should have "count[ed] all the books[ because] that's what other bookstores do." (Oral Arg. Tr. at 43.)

Mr. Bartholomew, however, explained that the Department's conception of the physical count methodology is a misnomer because the method does allow estimates of homogenous items, such as books, that are based on identifiable standards (e.g.,

11

volume, size, inches).  (See Trial Tr. at 32-33.)  Mr. Bartholomew also testified that Mr. von Erdmannsdorff's grouping of the books, based on their size and genre, was consistent with industry standards.  (See Trial Tr. at 32-33, 60.)  Consequently, the von Erdmannsdorffs' evidence refutes the Department's claim that the inventory of their books was not probative because it utilized an estimate, not an actual count.

### 3.  Estimated Inventory Costs

Next, the Department argues that the von Erdmannsdorffs' reconstructed inventories are not reliable because they "did not include any tracking of the [actual] value of [the] inventory[,]" but instead used estimated costs.  (See Resp't Br. at 15; Oral Arg. Tr. at 43-44.)  This argument, however, is unavailing given that Mr. Bartholomew testified that when it comes to reconstructing inventories over a ten-year period, the average price of homogenous items "is normally the most reasonable" way to value the items.  (See Trial Tr. at 33-34, 60-61.)  Consequently, the Department has not shown that the reconstructed inventories are unreliable because they used an item's estimated cost rather than its actual cost.

### 4.  Straight-line Adjustments

The Department also claims that the reconstructed inventories are unreliable because they incorporated straight-line adjustments.  (See Resp't Br. at 15.)  The Department explains that while the von Erdmannsdorff's spent a "great deal of time and energy highlighting the changes in their business and the market for their goods[,]" they failed to capture those changes by using straight-line adjustments that treated the "inventory [as if it] continued to grow or shrink at the same rate each and every year." (Resp't Br. at 15.)  The von Erdmannsdorffs' unrebutted trial evidence refutes this claim

12

as well.

During the trial, Mr. von Erdmannsdorff and Mr. Bartholomew explained that the reconstructed inventories used additional short-term adjustments to capture abnormal changes in inventory, including the rapid disposition of the VHS and CD inventories and the increased purchases of other items, such as used books, DVDs, and beads. (See Trial Tr. at 44-46, 72-86, 95-96, 112-13; Stip. ¶¶ 19(A), 22(S), Exs. 15-J(A), 17-J(S).) (See also Trial Tr. at 122-31.) Mr. von Erdmannsdorff also presented several articles that not only detailed the gradual decline of VHS tapes and CDS in their respective industries, but also substantiated his claim that his VHS tape and CD inventories became obsolete during the years at issue. (See Stip. ¶¶ 22(K)-(L), 22(N)-(O), Exs. 17-J(K)-(L), 17-J(N)-(O); Pet'rs' Second Req. Judicial Notice, Exs. AA - PP.) (See also, e.g., Trial Tr. at 43-44, 56.) Moreover, the fact that Von's Video and Comics closed in 2006 and moved the remaining VHS tapes and comic book inventory to Von's Shops in spaces once occupied by CDs, further substantiates Mr. von Erdmannsdorff's claim regarding the obsolescence of his VHS tape and CD inventories. (See, e.g., Trial Tr. at 75-86, 123-30; Stip. ¶¶ 22(B)-(D), Exs. 17-J(B)-(D).) Consequently, the Court finds the Department failed to show that the reconstructed inventories' use of straight-line adjustments rendered them unreliable.

### 5. Rental Property

Finally, the Department claims that the reconstructed inventories are not reliable because they improperly treated property held for rent (i.e., the VHS tapes and DVDs) as if it were property held for resale. (See Resp't Br. at 10.) The Department explains that the VHS tapes and DVDs should have been depreciated as rental property, not

13

included in COGS as if they were inventory. (See Resp't Br. at 10 (citing I.R.S. Publication 946 at 5 (2010).) The Department's claim is unpersuasive for two reasons.

First, the unrebutted evidence established that Mr. von Erdmannsdorff sold VHS tapes and DVDs during the years at issue and that their useful lives were, at times, less than one year. (See Stip. ¶ 2; Trial Tr. at 83, 118, 129-30.) Second, although IRS Publication 946 contains information regarding the treatment of inventory, the Department did not show the Court how the Publication established that the von Erdmannsdorffs erred when they included the VHS tapes and DVDs in their reconstructed inventories. See I.R.S. Publication 946 at 5 (2010). Consequently, Mr. von Erdmannsdorff could choose whether to recover the cost of the property by expensing it, depreciating it, or including it in the COGS. See, e.g., Rev. Rul. 89-62, 1989-1 C.B. 78 (1989) (regarding expensing and depreciation); Retail Indus. Audit Technique Guide, 2009 WL 9522670, at *49 (I.R.S. Feb. 2009) (regarding depreciation and COGS). Therefore, the Department has not shown that the reconstructed inventories are unreliable on this basis either.

## B. The Insurance Records

During the trial, the von Erdmannsdorffs presented copies of insurance records from a 2005 "fire loss and insurance claim" for Von's Shops that valued its inventory at $1,649,146 as of November 29, 2005. (See Sec. Stip. ¶ 2, Ex. 23-J.) The insurance company arrived at that value by conducting an inventory of Von's Shops based on an actual count of its merchandise and cost information derived from its written invoices and from Mr. von Erdmannsdorff. (See Trial Tr. at 97-99, 109, 132-34; Sec. Stip. ¶ 2, Ex. 23-J at 539.)

14

The Department claims that the insurance records do not substantiate the von Erdmannsdorffs' reconstructed inventories because they "clearly state that they rely on information provided by [the von Erdmannsdorffs], but no documentation has been provided to this Court" to prove that the information is accurate. (See Resp't Br. at 14; Oral Arg. Tr. at 49-50.) The Department further claims that the insurance records themselves are unreliable because the von Erdmannsdorffs and the insurance company's interests were "directly aligned[:]"

> The insurance company would have had a financial interest in minimizing [its] liability for damage, which would have been accomplished by understating the amount and value of the inventory owned by [the von Erdmannsdorffs]. Similarly, the [von Erdmannsdorffs] . . . have an interest in minimizing the amount of inventory on hand during the [years at issue], as this would reduce their taxable income and minimize any tax liability.

(Resp't Br. at 14.)

The von Erdmannsdorffs' trial evidence, however, demonstrated the reliability of the insurance company records as corroboration for their estimates. The trial evidence showed that the insurance company conducted an independent, third-party count of Von's Shops' actual inventory in processing the insurance claim. (See Trial Tr. at 97-98, 132-34.) Moreover, Mr. von Erdmannsdorff testified that although used book vendors usually did not provide him with invoices, he did provide the insurance company with used book invoices when he had them. (See Trial Tr. at 111-12.)

The Department has provided nothing more than allegations that the insurance company's inventory is unreliable, presuming the Court will find this conclusion self-evident. The Court does not find, however, that the insurance company's inventory is inherently unreliable simply because it used cost information based on written invoices

15

and Mr. von Erdmannsdorffs' estimates. Furthermore, the Department's suggestion that the insurance company's records are not reliable because the von Erdmannsdorffs and the insurance company's interests were "directly aligned" is unavailing because it is a bald allegation lacking evidentiary support. See, e.g., Knox Cnty. Prop. Tax Assessment Bd. of Appeals v. Grandview Care, Inc., 826 N.E.2d 177, 184-85 (Ind. Tax Ct. 2005) (providing that when allegations are unsupported by factual evidence they remain mere allegations).

Here, the unrebutted evidence shows that the insurance company valued Von's Shops' inventory at $1,649,146 as of November 29, 2005, and Mr. von Erdmannsdorff valued Von's Shops inventory at $1,770,552 as of December 31, 2005. (See Sec. Stip. ¶ 2, Ex. 23-J at 530, 539-43; Stip. ¶ 22(S), Ex. 17-J(S).) There is no indication that Mr. von Erdmannsdorff relied on the insurance company's records in arriving at his valuation. (See Stip. ¶ 22(S), Ex. 17-J(S); Trial Tr. at 97-98; Sec. Stip. ¶ 2, Ex. 23-J at 530.) Indeed, the evidence shows that Mr. von Erdmannsdorff relied on the 2000 and 2009 Inventories to arrive at his valuation. Consequently, the Court finds that the insurance records do corroborate the von Erdmannsdorffs' reconstructed inventories.

## II. The Department's COGS Estimates

As previously mentioned, the Department based its COGS estimates for all the years at issue on the 2006 BizStats' compilation of business data from the category labeled "sole proprietorship sporting goods-hobby-book-music stores." The von Erdmannsdorffs claim that the Department's COGS estimates are not reliable because they a) were derived from a BizStats category that is not comparable to Von's Shops and b) produced COG estimates that are inconsistent with several other undisputed

16

facts.  (See Pet'rs' Br. at 12-25; Oral Arg. Tr. at 4-7.)

## A.  The BizStats Category

The Department asserts its COGS estimates are reliable because they were based on the BizStats category that "accurately describes several of the industries in which [Mr. von Erdmannsdorff's] business was engaged," given that he has admitted to selling books, music, and several hobby items (e.g., beads, rocks, and guitar strings). (See Resp't Br. at 9-11 (citing Trial Tr. at 73, 114); Oral Arg. Tr. at 37-39.)  Moreover, there is no dispute that Von's Shops rented VHS tapes and DVDs and sold comic books, new/used books, music in vinyl and CD formats, beads, greeting cards, rocks, VHS tapes, DVDs, guitar strings, and several other items.  At first blush, therefore, the name of the BizStats category itself, "sole proprietorship sporting goods-hobby-book-music store," suggests that it includes businesses like Von's Shops.  Its very name, however, also suggests that it includes businesses dissimilar to Von's Shops (i.e., sporting goods stores) and excludes others that are similar (i.e., video rental stores). Consequently, additional details regarding the actual make-up of the businesses in the BizStats category are needed to ascertain whether any of these facial differences may have an impact on the reliability of the Department's COGS estimates.  See, e.g., Peters v. Garoffolo, 32 N.E.3d 847, 853 (Ind. Tax Ct. 2015) (stating that to establish the comparability of real property, the proponent of the evidence must explain the characteristics of the subject property, how those characteristics relate to those of the purportedly comparable properties, and how any differences between the properties affected their relative values).

During the trial, one of the Department's witnesses explained that BizStats

17

classifies businesses consistent with the six-digit North American Industry Classification System (NAICS) code[5] contained on taxpayers' federal income tax returns. (See Trial Tr. at 181.) While Mr. von Erdmannsdorff's federal income tax returns contained two different six-digit NAICS codes, his reporting does not indicate whether the Department's chosen BizStats category is consistent with his NAICS codes, nor does his use of the NAICS codes shed light on the actual make-up of the BizStats category. (See, e.g., Stip. ¶¶ 9, 18(B), 18(F), Ex. 3-J, Confd'l Exs. 14-J(B) at 103 (Line B), 14-J(F) at 125 (Line B).) Moreover, the Department did not provide any specific details regarding the BizStats category businesses, such as the number of sporting goods stores or music stores, the sizes of the stores, or the geographic locations of the stores. (See, e.g., Trial Tr. at 167-69.)

In contrast, the von Erdmannsdorffs' evidence demonstrated that their COGS estimates for Von's Shops' new books and music inventories were higher than the BizStats sales financial ratio of 56.48%. (See Stip. ¶ 22(H)-(I), 22(K)-(L), Exs. 17-J(H)-(I), 17-J(K)-(L), Trial Tr. at 101-102.) They also demonstrated that factors unique to the video rental and music industries rendered Von's Shops VHS and CD inventories increasingly obsolete. Thus, the von Erdmannsdorffs demonstrated that the Department failed to account for factors that may have caused the COGS of businesses in the BizStats category to vary from the BizStats figure of 56.48% that the Department used for its COGS estimates. (See Trial Tr. at 167-68.) Given the totality of the evidence, and the lack thereof, it is unreasonable to infer that the BizStats category the

---

[5] "The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy." North American Industry Classification System, U.S. CENSUS BUREAU, https://www.census.gov/eos/www/naics/index.html (last visited Sept. 5, 2017).

18

Department used is comparable to the business profile of Von's Shops. Therefore, the Court finds that the Department's use of the BizStats category for a sole proprietorship sporting goods-hobby-book-music store detracts from the reliability of its COGS estimates.

**B. Other Inconsistencies**

The von Erdmannsdorffs also contend that the Department's COGS estimates are not accurate because they "produce[d] ending inventory increases, inventory turnovers, and gross profit margins" that are inconsistent with the facts. (See Pet'rs' Br. at 18-19.) The Court will address these three claims in turn.

**1. The Ending Inventory Increases**

The von Erdmannsdorffs first assert that the Department's COGS estimates are inaccurate because they showed that Von's Shops' ending inventory had continued to increase each year during the ten-year assessment period. (See Pet'rs' Br. at 19-23 (citing Trial Tr. at 48-51, Trial Ex. 3-P; Stip. ¶ 22(X), Confd'l Ex. 17-J(X) (indicating that the Department's ending inventory figures for the years at issue were 318% higher than those of the von Erdmannsdorffs)).) The von Erdmannsdorffs maintain that inventory increases were neither realistic nor plausible because their unrebutted evidence shows they had reduced their existing inventory and purchased fewer new items during that period in response to both the obsolescence of VHS tapes and CDs and the closure of Von's Video and Comics. (See Pet'rs' Br. at 20-22.) (See also, e.g., Trial Tr. at 73-82, 122-30, 147-48; Stip. ¶¶ 22(G)-(L), Exs. 17-J(G)-(L).)

The Department does not dispute that its COGS estimates indicate that Von's Shops' inventory increased during each of the years at issue. (See generally Resp't Br.;

Oral Arg. Tr. at 30-54.) Without directly addressing this argument, however, the Department counters that its use of BizStats' data was proper because when it used the total sales and total purchases data that Mr. von Erdmannsdorff had provided during the audit to determine Von's Shops' COGS, "the resulting calculations distorted [the von Erdmannsdorffs'] income." (See Resp't Br. at 6 (citing Stip. ¶ 16, Confd'l Ex. 12-J at 67; Trial Tr. at 164).) The Department's response is unpersuasive for two reasons.

First, while the Department's argument suggests that its authority to use BizStats and the manner in which it used the BizStats data are at issue, they are not. Rather, the present issue simply concerns the accuracy of the Department's COGS estimates given the evidence introduced at trial. Second, the evidence on which the Department has relied indicates that it <u>believed</u> that the use of total purchases would overstate Von's Shops' COGS due to the amount of its obsolete inventory; it does not indicate, however, that the Department actually performed any calculations to verify that belief. (See Stip. ¶ 16, Confd'l Ex. 12-J at 67; Trial Tr. at 164.)

The United States Tax Court has explained that

> [t]he cost of goods sold is determined by adding to opening inventory for the year the purchases (cost of goods acquired during that year) and subtracting from that sum the closing inventory (goods still on hand at the end of that year). Thus, any undervaluation of ending inventory for a taxable year increases the cost of goods sold, decreases the income from sales, and results in a lower profit for that year.

Primo Pants Co. v. C.I.R., 78 T.C. 705, 723 (T.C. 1982). Consequently, because the ending inventories derived from the Department's COGS estimates are not supported by the evidence, it is more probable that the Department's COGS estimates are too low and that its calculations of the von Erdmannsdorffs' taxable income for the years at

20

issue are too high.  Accordingly, on this basis, the von Erdmannsdorffs have shown that the Department's COGS estimates are less reliable than theirs.

### 2.  Inventory Turnovers

The BizStats data states that inventory as a percentage of sales for a sole proprietorship sporting goods-hobby-book-music store is 20.52%.  (Stip., ¶ 9, Ex. 3-J.) The von Erdmannsdorffs contend that "[t]his means that, on average, [the] businesses [within this BizStats category] turned their inventory over nearly 5 times in 2006[,]" but the Department's COGS estimate only "produce[d] an inventory turnover [for Von's Shops] of once every 2.88 years."  (See Pet'rs' Br. at 23-24; Pet'rs' Post-Trial Reply Br. at 2-3.)  Moreover, the von Erdmannsdorffs' evidence shows that "Von's Shops barely turned its inventory over once" during the 2006 tax year.  (See Pet'rs' Br. at 23-24 (citing Trial Tr. at 49-51; Trial Ex. 3-P, Table 4; Stip. ¶ 22(X), Confd'l Ex. 17-J(X)).)

The Department, on the other hand, maintains that the von Erdmannsdorffs are wrong because:

> [i]nventory as a percent of sales is a distinct metric from inventory [turnovers].  Although the [von Erdmannsdorffs] attempt to imply that this figure means that inventory was flipped over 5 times, it can also indicate other phenomena.  A lower figure for inventory as a percent of sales can indicate obsolescence, where some items in inventory are sold that were not replaced.  This would lead to an increase in sales and a decrease in inventory.

(Resp't Br. at 10.)  The Department, however, has not supported this contention with any binding authority, persuasive authority, or evidence.  Therefore, the Court declines to give any weight to the Department's claim in this regard.

### 3.  Gross Profit Margins

Finally, the von Erdmannsdorffs claim that its evidence demonstrates that Von's

Shops sold music and books at steep discounts and purchased other items at rates exceeding the BizStats sales financial ratio of 56.48%; thus, its gross profit margins for those items were substantially less than the BizStats gross profit margin of 43.52% relied on by the Department. (See Pet'rs' Br. at 24-25 (citing Stip. ¶¶ 9, 18(V), Ex.3-J, Confd'l Ex. 14-J(V); Trial Tr. at 101-03, 105, 151).) In response, the Department merely states that its COGS estimates are accurate because its audit figures are consistent with certain census data. (See Resp't Br. at 18-19.)

The census data on which the Department relies concerns the same BizStats category that the Court found detracts from the reliability of the Department's COGS estimates. Accordingly, the census data sheds no further light on the composition of the BizStats category. See, e.g., Annual Retail Trade Survey Methodology, U.S. CENSUS BUREAU, http://www.census.gov/retail/arts/how_surveys_are_collected.html (last visited Sept. 5, 2017). Consequently, the census data does not rebut the von Erdmannsdorffs' evidence concerning the gross profit margin inconsistencies. Therefore, the Court finds that the Department's COGS estimates unreliable on this basis as well.

**CONCLUSION**

For all the reasons stated above, the Court finds that the Departments Proposed Assessments, while properly based on the best information available when originally issued, should have been adjusted to reflect the more reliable evidence presented during the administrative protest and the original tax appeal. Accordingly, the Court finds in favor of the von Erdmannsdorffs and against the Department.